UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

COREY CUSACK, individually,

     Plaintiff,

     v.

BENDPAK, INC., a foreign corporation,

     Defendant.

Case No. 4:17-cv-00003-DCN

**MEMORANDUM DECISION AND ORDER**

# I. INTRODUCTION

Pending before the Court is Plaintiff Corey Cusack's Motion to exclude the expert testimony of Joshua Yanes—one of Defendant BendPak, Inc.'s ("BendPak") expert witnesses. Dkt. 68. BendPak has also filed three Motions seeking to exclude or limit the testimony of three of Cusack's experts. Dkts. 69, 70, 71. After BendPak filed its motions, Cusack filed a Motion to Strike (Dkt. 75), seeking to strike Exhibit F (Dkt. 71-7) filed by BendPak in support of its third Motion to exclude (Dkt. 71). Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motion without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(2)(ii). For the reasons outlined below, the Court will GRANT Cusack's Motion to Exclude the Testimony of Joshua Yanes, GRANT in PART and DENY in PART BendPak's Motion to Exclude the Testimony of Scott Kimbrough, DENY BendPak's Motion to Exclude

Certain Portions of Tyler Bowles' Testimony, GRANT Cusack's Motion to Strike Exhibit F, and DENY BendPak's Motion to Exclude the Testimony of Hugh Selznick.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This matter involves an allegedly defective car lift accessory part that malfunctioned and injured Cusack. On or about February 8, 2011, Corey's Auto Works, LLC, an automobile service and mechanical shop, owned and operated by Corey Cusack, purchased a BendPak Car Lift System and two RJ-7 Rolling Jacks.

On or about June 27, 2014, while Cusack was working at his garage, he realized that one of the Rolling Jacks on the BendPak Car Lift was out of proper position and went over to correct the problem. It is unclear how, but one of the Rolling Jacks fell off the Car Lift System and landed on Cusack's foot, crushing it. Cusack asserts he sustained various injuries and damages as a result. He further alleges that BendPak knew the Rolling Jacks posed a risk of serious harm but did nothing about it.

This case is now approaching trial. The Court has made substantial rulings on various matters. At the current junction, the parties have filed *Daubert* Motions seeking to limit, or altogether exclude, the testimony of experts who will testify at trial. The Court will address each motion—and the corresponding expert—in turn.

## III. LEGAL STANDARD

The extent to which experts may render an opinion is addressed under the well-known standard established in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny, and now set forth in Rule 702 of the Federal Rules of Evidence.

*See Moore v. Deer Valley Trucking, Inc.,* No. 4:13-CV-00046-BLW, 2014 WL 4956241, at *1 (D. Idaho Oct. 2, 2014).

Rule 702 establishes several requirements for admitting an expert opinion. First, the evidence offered by the expert must assist the trier of fact either to understand the evidence or to determine a fact in issue. *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010); Fed. R. Evid. 702. "The requirement that the opinion testimony assist the trier of fact goes primarily to relevance." *Id.* (internal quotation marks and citation omitted).

Additionally, the witness must be sufficiently qualified to render the opinion. *Id.* If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a witness qualified by knowledge, skill, experience, training or education may offer expert testimony where: (1) the opinion is based upon sufficient facts or data, (2) the opinion is the product of reliable principles and methods; and (3) the witness has applied those principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *Daubert,* 509 U.S. at 592–93; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The inquiry is a flexible one. *Primiano*, 598 F.3d at 564. Ultimately, a trial court must "assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* (internal quotation marks and citation omitted).

Reliability and relevance, however, must be distinguished from problems with expert opinions that amount to impeachment and, consequently, do not warrant exclusion. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (stating that, under *Daubert*, "[t]he judge is 'supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.'" (quoting

*Alaska Rent–A–Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013))).

Thus, "[a]s *Daubert* confirmed, '[v]igorous cross-examination, presentation of contrary

evidence, and careful instruction on the burden of proof are the traditional and

appropriate means of attacking shaky but admissible evidence.'" *United States v. Wells*,

879 F.3d 900, 933 (9th Cir. 2018) (quoting *Daubert*, 509 U.S. at 596).

## IV. DISCUSSION

### A.  **Cusack's Motion to Exclude Testimony of Joshua Yanes (Dkt. 68)**

Cusack seeks to exclude the testimony of BendPak's expert Joshua Yanes on the

basis that he is not qualified to testify. Alternatively, if the Court determines that Yanes is

qualified, Cusack alleges that his opinions are nonetheless irrelevant and unreliable.

Joshua Yanes is a staff engineer employed by Vollmer-Gray Engineering

Laboratories. Yanes has a bachelor's degree in engineering. Yanes claims that his area of

expertise includes "fork lift, boom lift, [and] scissor lift accident analysis." Dkt 78-2, at 2.

Yanes has certifications associated with these types of lift systems. Yanes has never

testified at trial or in a deposition.

Cusack claims that Yanes is inexperienced and unqualified to render an opinion on

the equipment at issue in this case. Cusack cites to Yanes' lack of an advanced degree or

practical experience with car lifts and jacks as reasons warranting exclusion of his

testimony. Furthermore, Cusack postures that even if the Court were to entertain Yanes

as an expert, his opinions are severely lacking.

The fact that Yanes has never testified as an expert before is of little importance to

the Court. Everyone must start somewhere. His lack of experience in litigation may make

him impeachable but it does not make him unqualified. Of greater concern, however, is the fact that although Yanes's field of expertise is *related* to the subject matter of this lawsuit, it is not clear whether this is enough to qualify him as an expert on the technology at issue. The closest experience Yanes has to car lifts is his assertion that he specializes in fork lift, boom lift, and scissor lift accident analysis. Yanes has not explained, however, how being an expert in these areas qualifies him as an expert on the topic of automobile lifts or—more critically—rolling jacks. BendPak's assertions that the mechanism and operations of these various lift systems are similar is not sufficient to meet this burden. The Court understands that they are both lift systems, but they utilize different technology and ultimately have different specifications and purposes. Without any evidence of the connection between these two mechanisms, the Court concludes that Yanes's testimony strays from the "reasonable confines of his subject area." *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (internal quotation marks omitted). *See also*, *Stewart Title Ins. Co. v. Credit Suisse*, No. 1:11-CV-227-BLW, 2015 WL 4250704, at *11 (D. Idaho July 13, 2015) (finding that an attorney expert witness was not qualified to testify regarding title insurance even though he had 30 years' experience representing clients in casualty insurance and general insurance bad faith.)

Even assuming, arguendo, that Yanes was qualified to testify, his opinions lack relevant support, are speculative, or are otherwise not true expert opinions. The Court will briefly address each of Yanes's conclusions below and the reasons the Court finds them unpersuasive.

1. *Cusack understood that the BendPak RJ-7 rolling bridge jack is heavy and that a cherry picker or crane is needed to lift it on or off the rails.*

The first problem with this conclusion is it appears to be a mere recitation of the facts as understood by Cusack, i.e., no expert testimony is needed for this conclusion. Second, and more importantly, this opinion strays into the human factors field, i.e. what Cusack *understood*.

Human factors analysis is a scientific discipline that develops and applies knowledge about how people use and interact with machines, systems, and environments. *See Goehring v. Flying J, Inc.*, No. CV 99-007-S-MHW, 2005 WL 6190823, at *2 (D. Idaho Apr. 23, 2005). Yanes has not identified himself as a human factors expert nor does he give any support for his conclusions interpreting Cusack's behavior or alleged understanding. What Cusack may or may not have understood, or how he may or may not have reacted under certain conditions, are topics that Yanes is not qualified to speak to.

2. *It is likely that the grooved rollers for the jack were off track while the lift was previously on the ground and possibly before the Subaru was driven on the lift runways.*

This conclusion is pure speculation. Yanes does not identify any tests, measurements, or other research he conducted specifically concerning the RJ-7 Rolling Jacks that would aid the jury in understanding when, and how, the RJ-7 jack came off the tracks. "Likely" and "possibly" are not enough. It appears that Yanes visited Cusack's business, inspected the car lift and rolling jacks, and then opined as to certain possible outcomes. Without further testing or experimentation

as to how and why rolling jacks come off track, this conclusion is speculative and not the proper basis for expert testimony.

Mere speculation is insufficient to support an expert opinion. *Pierson v. Ford Motor Co.,* 445 F. App'x 966, 968 (9th Cir. 2011) (finding that "an expert's opinions and conclusions which are based on nothing more than speculation cannot constitute substantial evidence"); *see also Daubert,* 509 U.S. at 590 (noting that expert testimony based on mere "subjective belief or unsupported speculation" is inadmissible).

> 3. *Cusack understood the caution decal found on the front of the subject rolling bridge jack and should have lowered the lift before attempting to align the jack rollers back on the utility rail to avoid serious bodily harm.*

This assertion is very similar to Yanes' first conclusion and suffers from the same flaws. Cusack does not dispute that he was aware of the caution decals and was aware of the recommendation that he lower the jack before trying to adjust it. As before, this recitation of Cusack's testimony does not require expert witness testimony. Second, Yanes is not a human factors expert and his opinion as to what Cusack understood about the caution decals or how he acted based upon that knowledge is outside the scope of his expertise.

Finally, there appears to be some misunderstanding concerning the facts of the case. Cusack never actually touched the front rolling jack that ultimately fell on his foot. Although Cusack testified that he *intended* to adjust the front rolling jack to get it back on track, he never actually got to that point. When Cusack noticed that the front rolling jack was off track he went over to the Car Lift System to investigate. He rolled the rear rolling jack backwards on the track to gain access

to the displaced front rolling jack. While thus engaged, the front rolling jack fell

on his foot. In other words, Cusack never actually tried to lift, align, adjust, move,

or push the front rolling jack back in place—it fell on his foot before he even had

the chance. Thus, phrases like "attempting to align" are inapposite to the facts.

Cusack never attempted anything. He *intended* to, but never actually did,

therefore, this conclusion appears to be based upon a false premise.

4. *The unknown employee failed to follow the manual and decal instructions of checking to make sure the jack was positioned correctly on the runway rail assembly before raising the lift.*

As Cusack notes, this conclusion is shrouded in speculation. Because the

unknown employee's identity is not known, it is impossible to know whether he

"failed to follow the manual and decal instructions," or "check[ed] to make sure

the jack was positioned correctly." Yanes further assumes that the jack was off the

track in the first place, i.e., when the lift was still on the ground, adding yet

another layer of speculation. The unknown employee may very well have done all

that was required of him—followed the manual and checked the rolling jack—and

finding nothing wrong, raised the car on the lift. The dislodging of the jack could

have happened *despite* these efforts. There is simply no way of knowing.

That being said, it is not a complete stretch to see why Yanes reached this

conclusion—it appears to be a logical inference derived from the known facts—

however, without additional facts, a reliable methodology, or some type of

evidence in support of this argument, it remains mere speculation, which the Court

cannot accept as expert testimony.

5. *Cusack created an unsafe situation by failing to follow the manual and decals and positioning himself near the underside of an unstable extremely heavy object.*

Assuming the "extremely heavy object" is the rolling jack—rather than the vehicle itself—this conclusion is speculative and again appears to misapply the facts. At this point, there is no indication that Cusack failed to follow the manuals and decals *up to the point the rolling jack fell*. Granted, Cusack has testified that he *intended* to try to move it himself—the implication being he would have tried to do this in the air rather than on the ground—but frankly, this remains unknown.

Second, to say Cusack "position[ed] himself near the underside of [the] . . . heavy object" is slightly misleading. At no point was Cusack physically underneath the rolling jack. His foot presumably was—as it was crushed—but saying someone is "near" the underside of something is extremely vague. In the car repair business, a person is frequently near the underside of unstable, heavy objects. This fact alone, however, does not mean that Cusack created an unsafe situation or failed to follow the manual.

6. *Cusack has formal education and many years of experience working with hoisted heavy objects above head level and should already understand the dangers of standing underneath the path of a possible falling object.*

Like conclusion one, this appears to be nothing more than a recitation of Cusack's deposition testimony. This may be appropriate for closing arguments, but is not an appropriate expert conclusion.

And as before, this conclusion relies on human factor analysis—what Cusack *should* have understood about the situation based upon his experience—which the Court has already concluded is not within Yanes' expertise.

> 7. *The BendPak RJ-7 rolling bridge jack is in compliance with the American National Standard for automotive lifts ANSI/ALI ALCTV:2006 section 9.2.21 in respect to inhibiting movement for rolling jack beams.*

Cusack does not take issue with this conclusion. BendPak claims that because there is no dispute as to this fact, the Court should allow Yanes to testify on the topic. Because Cusack has essentially "stipulated" to this fact expert testimony is unnecessary. The Court has dealt with this topic before and it seems that is has been clearly established that the RJ-7 Rolling Jacks comply with applicable national standards.

> 8. *Review of the domestic market showed that competing rolling bridge jacks designs did not include any devices to prevent vertical displacement.*

Cusack questions the sample size Yanes uses in reaching this conclusion. It appears to be derived from Yanes' review of four different company's manuals. While this does seem like a small sample size, it is not clear how many manufacturers of rolling jacks there are. Maybe Yanes' list is conclusive, maybe it is not. More concerning to the Court is the relevance of this final conclusion. Similar to the above, this opinion is somewhat irrelevant, and if relevant, it faces only limited disagreement from Cusack. To be sure, Cusack disagrees with Yanes' assertion that BendPak's design meets **and exceeds** competitors within the industry and with Yanes' methodology. However, Cusack does not dispute that some manufacturers within the industry—namely the ones reviewed by Yanes—

do not have a "secondary safety bracket" or other device to prevent vertical displacement. The Court agrees that Yanes' report lacks support for his assertion that BendPak *exceeded* industry standards—after all, having a feature that other designers do not have does not automatically mean the product is inherently better. Yanes' simple assertion that other manufacturers do not have vertical displacement devices will come to light during trial through other witnesses and testimony.

In sum, Yanes does not have the necessary expertise to testify as an expert in this case. Even if the Court allowed his tangential expertise to encompass car lifts and rolling jacks, his conclusions are speculative, irrelevant, or otherwise lack supporting evidence. Cusack's Motion to Exclude the Testimony of Joshua Yanes is GRANTED.

### B. **BendPak's Motion to Exclude Testimony of Scott Kimbrough (Dkt. 69)**

In this Motion, BendPak seeks to exclude the report and testimony of Scott Kimbrough—one of Cusack's experts. Cusack hired Kimbrough to opine on the applicable standard of care of the manufacture, design, and production of the RJ-7 Rolling Jacks and BendPak's secondary safety bracket. BendPak asserts that Kimbrough is not qualified to testify on the subject matter of his first opinion and that his other opinions lack foundation. The Court will address each in turn.[1]

---

[1] Kimbrough's conclusions are written broadly in paragraph form. BendPak has summarized Kimbrough's findings into four general propositions. The parties briefed the issue using these four conclusions and the Court will utilize the same for convenience.

1. *It was economically feasible to create an alternative design to the BendPak Car Lift, and it was economically feasible to provide the safeguard to existing customers.*

BendPak alleges that Kimbrough is not qualified to testify on matters of economic feasibility as he is an engineer, not an economist. The Court agrees. Although Kimbrough is a very accomplished engineer—and even took some economic classes—this is not enough to qualify him as an economist. The Court has reviewed the extensive summary of cases in which Kimbrough has testified and while expansive, the Court cannot find any testimony associated with economics. As noted in the Court's discussion of BendPak's expert Joshua Yanes, an expert's testimony must stay within the "reasonable confines of his subject area." *Avila*, 633 F.3d at 839.

Kimbrough asserts that his conclusions are not necessarily "economic," but just simple math. He explains that he took the cost of the secondary safety bracket and multiplied that by the number of BendPak customers. While such a computation is simplistic, the simplicity of Kimbrough's evaluation also weighs against it. Kimbrough did not take into account other cost variables such as identifying and contacting customers, shipping, and installing the secondary safety bracket. Finally, this type of argument—that there was a "simple cheap" fix—might[2] be appropriate for closing argument, but the Court will not allow an engineer without any prior "economic

---

[2] The Court uses "might" because, as will be explained in the following sections, the parties must be extremely careful how they introduce evidence of the secondary safety bracket in order to abide by the Court's prior rulings regarding the appropriate use of this evidence.

feasibility" experience to testify concerning what was or was not economically feasible for BendPak. Kimbrough will not be allowed to testify on this topic.

2.  *The BendPak Car Lift and Rolling Jack contains a manufacturing defect.*

In light of the stipulation to dismiss Count Two – Manufacturing Defect (Dkt. 74), the parties agree that this topic is moot and that Kimbrough will not testify about manufacturing defects.

3.  *The BendPak Car Lift and Rolling Jack contains a design defect.*

Here, BendPak claims that Kimbrough should be prohibited from testifying concerning any design defect in the RJ-7 Rolling Jack. BendPak contends that this opinion is based solely upon the addition of the secondary safety bracket and because the Court has already concluded that evidence of the secondary safety bracket can only be introduced under a failure to warn (post-manufacturing) theory, this opinion must be excluded.

For his part, Cusack claims that Kimbrough's opinion is much broader than BendPak suggests. Cusack claims that Kimbrough's real opinion is simply that the rolling jack was defective because it was designed in such a way that it could fall off the rails and that Kimbrough's reference to the secondary safety bracket was just an example showing that BendPak knew there was a defect in the system.

Both sides exaggerate the strength of their respective positions. It is not entirely true—as BendPak asserts—that the secondary safety bracket is the sole evidence Kimbrough has in support of his design defect conclusion. It is also not

entirely true—as Cusack asserts—that Kimbrough supports his design defect conclusion with numerous other theories.

Cusack takes some of the phrases in Kimbrough's report out of context and argues they are "expert conclusions," when often, they are simply explanations or what the legal world might call "dicta."[3] On the other hand, BendPak completely discounts Kimbrough's overall proposition that the rolling jack was defective from the start because it could fall. This conclusion does not rely on the secondary safety bracket as evidence.

Ultimately the jury will have to weigh the credibility of such a conclusion—the fact that something can fall implies an inherent defect—but Kimbrough can testify to that general proposition or any other theories that he has relative to a design defect. He cannot, however, use the secondary safety bracket as an example. The Court has already determined that any evidence of the secondary safety bracket is limited to a post-manufacturing failure to warn theory. The Court will not allow Kimbrough, or anyone else, to reference the secondary safety bracket in support of a design defect—or any other pre-accident—theory.

In sum, Kimbrough will be allowed to testify concerning a design defect—broadly or specifically—utilizing any theory properly disclosed; however,

---

[3] Phrases, that because of how they are presented, are more along of the lines of editorializing rather than a final position or opinion.

Kimbrough **cannot** use the secondary safety bracket in support of any design

defect theory.

> 4. *BendPak violated a post-sale duty to warn by failing to warn existing users of the existence of secondary safety bracket/providing customers with secondary safety bracket.*

Finally, BendPak argues that the Court should exclude Kimbrough's testimony

regarding a post-sale duty to warn. BendPak asserts that because Kimbrough cannot

testify that there was a manufacturing defect or a design defect there can be no failure to

warn. In other words, because the Court will not allow evidence of the secondary safety

bracket for pre-accident manufacturing or design defect purposes, BendPak argues that it

also cannot be used to support a failure to warn customers of discovered post-

manufacturing defects. This simply is not true.

First, this assertion—as with the previous conclusion—incorrectly assumes that

Cusack does not have a viable design defect theory (because he cannot use the secondary

safety bracket as evidence). Because the Court will allow Kimbrough to testify regarding

a design defect (albeit without the support of the secondary safety bracket) there is the

possibility that Cusack could establish a design defect based upon other evidence.

Second, even if Cusack cannot establish an *original* design defect—a defect present from

the beginning—he may be able to establish a *discovered* design defect—one that

BendPak became aware of after the product was already on the market—and use that as

the basis for a failure to warn argument. In fact, this is the whole reason the secondary

safety bracket is even a part of this case. The Court has already specifically stated that,

under Idaho Code section 6-1406(1), Cusack will be allowed to introduce "evidence of

the additional safety bracket to support a 'failure to warn' (of discovered post-manufacturing defects) argument." Dkt. 58, at 8.

The statute is clear:

Evidence of changes in *(a) a product's design, (b) warnings or instructions concerning the product,* (c) technological feasibility, (d) "state of the art," or (e) the custom of the product seller's industry or business, *occurring after the product was manufactured and delivered to its first purchaser* or lessee who was not engaged in the business of either selling such products or using them as component parts of another product to be sold*, is not admissible for the purpose of proving that the product was defective in design or that a warning or instruction should have accompanied the product at the time of manufacture. The provisions of this section shall not relieve the product seller of any duty to warn of known defects discovered after the product was designed and manufactured.*

Idaho Code § 6-1406(1) (emphasis added). BendPak's addition of the secondary safety bracket was a "change in [the] product's design . . . occurring after the product was manufactured," and while evidence of this change is not admissible for proving "that the product was defective in design or that a warning or instruction should have accompanied the product at the time of manufacture" it can be used to show the seller failed to "warn of known defects discovered after the product was designed and manufactured." *Id.* A post-sale duty to warn argument is the exact reason the Court limited the evidence of the secondary safety bracket the way it did. It is not necessary to establish an initial defect.

Finally, BendPak claims that it must have actual knowledge of the defect before it is required to warn customers. First, this does not appear to be the correct standard for failure to warn claims. *See Puckett v. Oakfabco, Inc.*, 979 P.2d 1174, 1181 (Idaho 1999) (finding that "a product is defective if the defendant has *reason*

*to anticipate* that danger may result from a particular use of his product and fails to give adequate warnings of such danger) (emphasis added) (internal quotation marks and citations omitted). In other words, actual knowledge is not a prerequisite in a failure to warn claim.

Second, this assertion is somewhat inapposite to the facts. BendPak has stated on the record that it created the secondary safety bracket following an accident. All subsequent RJ-7 Rolling Jacks include this feature. Now, whether BendPak's introduction of the secondary safety bracket is viewed as a remedy for a discovered defect or just as an innovative upgrade to help a valued customer—as has been previously asserted—remains to be determined by a jury, but the Court will allow both perspectives to be presented. In summary, Kimbrough will be allowed to testify concerning a duty to warn based upon a post-manufacturing—or "discovered"—defect and use BendPak's introduction of the secondary safety bracket as evidence.

In conclusion, BendPak's Motion is GRANTED in PART and DENIED in PART. Kimbrough is not qualified to testify on matters of economic feasibility. The Court will exclude his testimony outlined in conclusion one. The Court has dismissed Cusack's manufacturing claim, and therefore Kimbrough's second conclusion is moot. Regarding conclusion three: Kimbrough can testify on the subject of design defects but cannot use the secondary safety bracket as supporting evidence. Finally, the Court will not exclude Kimbrough's testimony as outlined in conclusion four regarding Cusack's failure to warn argument. Furthermore, the

Court will allow him to reference BendPak's introduction of the secondary safety bracket in support of this theory.

### C. **BendPak's Motion to Exclude Certain Portions of Tyler Bowles' Testimony (Dkt. 70)**

In this Motion, BendPak asks the Court to exclude the portions of Tyler Bowles testimony relating to Cusack's future lost earning capacity. Cusack hired Bowles as an expert witness to opine on his past and future economic losses allegedly suffered as a result of the accident. Of Bowles' numerous conclusions, BendPak only challenges one: the present value of future lost earning capacity. BendPak's challenge here is not directed at Bowles' qualifications but rather the methodology he utilized to reach his conclusion.

Prior to his injury, it appears that Cusack was working approximately 67.5 hours per week. Since his injury, Cusack has been working approximately 56 hours per week. His time is divided roughly in half: 28 hours are devoted to mechanical work and 28 hours are devoted to managerial/supervisory work. Based upon certain physical restrictions, Cusack's doctors have recommended that he no longer engage in mechanical work. While Cusack intends to replace his mechanic hours with managerial/supervisory hours eventually, the business does not require that at this point. As a result, Cusack asserts that he has been deprived of 28 hours of work each week.

Based upon wage data and Cusack's own testimony, Bowles estimates that Cusack's hourly wage is approximately $30 per hour. In order to reach his conclusion, Bowles multiplied the 28 hours lost per week and 50 working weeks each year by this hourly rate. He then extended that loss over a five to ten-year period as Cusack testified it

could take that long to fully replace the 28 mechanic hours each week. Bowles then adjusted the totals downward for the gradual replacement of the hours over time.

BendPak asserts that this methodology is flawed because Cusack is not an hourly employee, but the owner of the business. Because he is the owner, the analysis should—according to BendPak—focus not on time lost as an individual, but on the financial loss—if any—on the business.

BendPak's conclusion is problematic for multiple reasons. First, the business is not the Plaintiff in this case; Cusack is. However, because Cusack is the owner, it is true that a loss to him (as an employee) is also very likely a loss to him (as the owner). Said differently, while the business and the person may be one in the same, the business—Cusack (the owner)—could only lose revenue if the mechanic—Cusack (the employee)—is unable to work the same hours as before. It is unclear if Cusack has hired another individual to replace the hours he would have worked but for the accident, but even assuming he has not—and that other employees are simply "covering" his work—that still doesn't account for Cusack's inability to work the same number of hours as he did (individually) before the accident. Whether he pays himself an hourly rate (thus losing income as an individual) or replaces his hours with another employee (thus losing revenue as an owner) is beyond the point. The bottom line is there is a gap in Cusack's ability to generate income as an employee because of the accident that must be filled.

Second, while BendPak brings up an interesting argument, it but does not provide a solution for solving the problem, except to say the Court should throw Bowles' testimony out completely. The Court is not willing to go that far. BendPak alleges that

Bowles should have looked at the business records rather than Cusack's testimony. It is not entirely clear, however, if this would have been more accurate because there are a number of variables. Cusack owns two businesses and has multiple employees (including himself). The financial picture of the business could look different depending on how each business is structured and how Cusack (the employee) and Cusack (the owner) are compensated. Additionally, even though a business may show gross income increasing each year, that may not necessarily equate to net income or year-over-year profits. All of these problems could make it equally difficult to ascertain future lost earnings for Cusack.

The Court is not convinced as to which view of Cusack's losses (i.e. losses as an employee or losses as the business owner) will be most helpful to the jury, but the methodology behind the process Bowles chose (in viewing Cusack as an hourly wage earner) appears sound.[4] Bowles reliance on Cusack's testimony was appropriate, using the state of Idaho wage data was appropriate, and weighing outside resources—limited as they were—concerning business owners who are also employees was also appropriate. Importantly, in the absence of strict procedures otherwise, computing the total loss based upon the cost to pay an employee to do the work that Cusack would have done but for his injury was a reasoned approach.

---

[4] The Court is not to determine "the correctness of the expert's conclusions but the soundness of his methodology." *Primiano*, 598 F.3d at 564 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995)).

It will be up to Bowles to convince the jury that his computation is more relevant than any alternatives, but the Court will not exclude it at this time. BendPak has not shown that their method is superior or would not have suffered from a similar margin of error or other problems. BendPak's challenges go to the weight of the evidence and it will have ample opportunity to cross examine Bowles and thoroughly scrutinize his conclusions. BendPak's Motion to Exclude Portions of Tyler Bowles' Testimony is DENIED.

### D. BendPak's Motion to Exclude Dr. Selznick's Opinion and Testimony Re: future medical expenses / Cusack's Motion to Strike Exhibit F.

In this Motion, BendPak seeks to exclude the testimony of Plaintiff's expert Hugh Selznick. Cusack hired Selznick to conduct an independent review of all applicable medical records and to render opinions on the same. In short, Selznick opines that Cusack may need cortisone shots in the future to cope with pain and possibly a midfoot arthrodesis procedure (fusion surgery). BendPak does not question Selznick's qualifications but rather his methodology and the correctness of his opinions. In support of its Motion BendPak provided an opinion from its expert, Michael Daines. Daines asserts that Selznick's opinions are not medically certain and that it is more likely than not that Cusack will not need either cortisone shots or fusion surgery. This opinion is attached to BendPak's motion as Exhibit F (Dkt. 71-7) and is the subject of Cusack's Motion to Strike. The Court will first address the motion to strike, followed by the motion to exclude.

Daines' opinion, outlined in Exhibit F, casts doubt upon Selznick's report and testimony regarding future medical treatment and expenses. BendPak couches this submission as an affidavit and asks the Court to consider it in support of its motion to exclude Selznick's testimony. Cusack, on the other hand, claims that this submission does not meet the requirements to be an affidavit, is nothing more than a letter to the Court, and must be stricken. Under the circumstances, the Court agrees.

First, the Court cannot accept this as an expert opinion as it is late. BendPak asserts that an affidavit can be filed after expert disclosure deadlines have passed if it simply reiterates or elaborates on opinions previously addressed. *See Truckstop.Net, L.L.C. v. Sprint Commc'ns Co., L.P.*, 537 F. Supp. 2d 1126, 1134 (D. Idaho 2008). While true, this only applies to documents that qualify as an affidavit in the first place. Here, the Court cannot accept this document as an affidavit because it does not comply with the rules for an affidavit, sworn declaration, or unsworn declaration. Under Idaho local rules all affidavits or declarations must be filed in conformance with 28 U.S.C. § 1746. See Idaho Loc. Civ. R. 7.1(b)(2). Under 28 U.S.C. § 1746, a declarant must state: "I declare (or certify, verify, or <u>state</u>) under penalty of perjury that the foregoing is true and correct." 28 U.S.C. § 1746(2).

The Ninth Circuit has held that a declaration need only "'substantially comply with [28 U.S.C. § 1746(2)'s] suggested language" for the Court to consider it as evidence. *Commodity Futures Trading Com'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1112 (9th Cir. 1999) (quoting 28 U.S.C. § 1746(2)). "Substantial compliance requires the declarant to make two assertions in the declaration: (1) that the statements in the

declaration were made 'under penalty of perjury,' and (2) 'that the contents were true and correct.'" *Luxul Tech. Inc. v. NectarLux, LLC*, No. CV 14–03656 LHK, 2016 WL 3345464, at *5 (N.D. Cal. June 16, 2016) (quoting *Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995)). Here, BendPak postures that some of the language could be construed as substantial compliance, however, it is undisputed that Daines never actually states that he makes the declaration "under penalty of perjury" or that the contents are "true and correct."

Accordingly, the Court will strike Exhibit F. The Court notes, however, that this is something of a moot point because it is in possession of Daines' original report which *is* properly before the Court and contains the same arguments—albeit not as specifically as found in the [now stricken] report—in support of his conclusions regarding future medical treatment which are at odds with Selznick's testimony.[5]

The Court now returns to the substance of BendPak's Motion to Exclude Selznick's testimony regarding future medical care.[6]

---

[5] Said differently, it is important for Cusack to understand that the Court is striking the *document* Exhibit F—and any *new* opinions contained therein—from consideration and trial, but not necessarily the underlying opinions of the report. To be sure, much of what is contained in Exhibit F is materially contained in Daines' original—and timely filed—report. Though Daines' opinions do not sway the Court in regard to Selznick's testimony, they may still be presented at trial.

[6] In its actual motion and opening brief, BendPak stated that its intent was to exclude Selznick's opinion regarding future medical care and damages. In its reply brief, BendPak states that this motion seeks to exclude the testimony of Selznick *and* Tyler Bowles. BendPak claims that some of Bowles monetary figures are based upon Selznick's report and if the Court strikes Selznick's report it must strike Bowles conclusions based upon the same. Bowles was *not* brought up in (Continued)

Broadly speaking, BendPak contends that Selznick's two conclusions—that Cusack may require cortisone shots and fusion surgery down the road—lack relevant support and are contrary to Cusack's treating physician's opinion.

First, BendPak argues that Selznick's opinions are unreliable as he only reviewed medical records and did not perform a physical assessment or examination of Cusack. Because he did not do this, BendPak alleges that Selznick's conclusions are not based upon generally accepted practices. A physical exanimation has never been a pre-requisite to admissible expert testimony and BendPak does not cite to any applicable rule, case, or statute that suggests otherwise. Somewhat ironically, BendPak's expert, Daines, did not perform a physical evaluation of Cusack either.

The Court has reviewed Selznick's report and finds that there is adequate support for his conclusions. Selznick did what any other retained medical examiner—including BendPak's expert—would do. He reviewed all available material relevant to the case and then—utilizing his experience, expertise, and training—made conclusions based upon that review. The fact that Selzneck did not exam Cusack may be effective cross-examination, but it does not make his opinion inadmissible.

---

BendPak's opening brief, therefore, Cusack has not had an opportunity to respond to this assertion. That aside, it seems fairly clear that the one (Bowles damages numbers based upon Selznick's testimony) will work in tandem with the other (Selznick's actual testimony). Because some of that has already changed (the estimated number of cortisone shots for example) there may need to be some adjustments at trial, but because the Court will not exclude Selznick's testimony, it need not outright strike Bowles figures either. The Court reserves ruling on Bowles figures until testimony has been presented at trial.

(Continued)

Next, BendPak takes issue with Selznick's conclusion regarding what medical care Cusack may require in the future. The first type of treatment Selznick believes Cusack may need is cortisone shots. Specifically, Selznick opines that over the next ten years, Cusack may need a cortisone shot once or twice a year to deal with the pain from this accident.[7] BendPak alleges that Selznick's cortisone recommendation claim finds no support in the medical community and that because Cusack has not needed a cortisone shot to date, there is no reason to suggest he will need any in the future.

The latter proposition is pure speculation. Just because Cusack has not needed cortisone shots up until this point does not mean that he will not need them moving forward. As for the idea that cortisone shots are not recommended in the medical community, the Court need look no further than Cusack's treating physician and BendPak's own expert.

Dr. Florian Nickisch, Cusack's treating physician, outlined that while he did not recommend cortisone shots *at the current time*, he did discuss with Cusack the "possibility of doing corticosteroid (cortisone) injection[s] . . . for pain relief." Dkt. 71-2, at 2. BendPak's own expert, Michael Daines, also stated that it is likely Cusack's would require future management of his conditions "which could include but [is] not limited to

---

[7] There is an ongoing, but wholly irrelevant, argument about whether Cusack will need cortisone shots through the year 2053. It appears BendPak's expert used 2053 as an example and Selznick (in his rebuttal report) agreed that there would be no reason for Cusack to have shots for that length of time. BendPak now asserts that this is a disavowal of the cortisone argument. It appears that Selznick was agreeing cortisone shots would not be needed for that long, but he was not abandoning his position all together. It is disingenuous for BendPak to claim that an example Daines raised, and with which Selznick agrees, now limits his past testimony.

injections of cortisone . . .." Dkt. 71-6, at 10. The real contention here is that Nickisch and Daines feel that it is *more likely than not* that these treatments will be *unnecessary*, whereas Selznick's opinion is that *more likely than not* these treatments will be *necessary*. This is a classic battle of the experts which must play out at trial before a jury where cross-examination and exploration can take place. The Court will not exclude Selznick's opinion simply because it differs from other expert opinions.

The second type of treatment that Selznick suggests Cusack may need is fusion surgery. In his report, Selznick states that "it is, more likely than not  . . . that a midfoot arthrodesis procedure (fusion) will have to be performed." Dkt. 71-3, at 17. BendPak argues, again, a lack of support in the medical evidence and that this is not a certain conclusion.

As to the evidence argument, as before, Selznick need look no further than Cusack's treating physician—ironically, the source BendPak asserts he must look to—to support the idea that surgery *may* be necessary. BendPak's own expert recognizes this possibility as well.

Nickisch explained in his summary of Cusack's situation that he "discussed [the] possibility of fusion across those joints if his symptoms continue to progress down the road. We recommended that he not pursue this option *at this point*, as it sounds he is able to cope with his symptoms via conservative measures at this time." Dkt. 71-2, at 2.

For his part, Daines notes that "[in] regards to the need for future surgery it is unclear whether this would be necessary, Dkt. 71-6, at 10, and that "it is therefore clearly not a foregone conclusion that Mr. Cusack will require future surgery." *Id.* Thus, to state

it in reverse, it is also not a foregone conclusion that Cusack *will not* require fusion surgery in the future.

Simply put, all three experts agree that it is not clear whether cortisone shots and/or fusion surgery will be necessary down the road—albeit Selznick feels that it is more likely than not that Cusack *will* need both treatments while Daines feels that it is more likely than not Cusack *will not* need either. With this uncertainty it is difficult for the Court to accept BendPak's assertion that Selznick's opinions are somehow unsupported, irrelevant, and unreliable. Daines relies on the same information, he just comes to an alternate conclusion. These differences are appropriate for the witness stand.

Finally, it appears that BendPak is relying upon an arbitrary—if not altogether incorrect—standard. BendPak asserts that Selznick "cannot demonstrate to a reasonable degree of medical *certainty*" (Dkt. 71-1, at 2) that Cusack will require the future care he suggests. Medical certainty, however, is not the applicable standard. At the outset, the Court notes that it is contradictory that Daines would assert this is the appropriate standard and that his opinions are "based upon reasonable medical certainty" when, in reality, he concludes that it is "more likely than not" that Cusack will need future medical care, and "unclear" if fusion surgery will be necessary. Dkt. 71-6.

The Ninth Circuit has not definitively weighed in on the "reasonable degree" standard for expert testimony on future medical care or expenses. Neither has this Court. Other federal courts—district and circuit—appear split as to whether the standard is a "reasonable degree of medical *certainty*" or a "reasonable degree of medical *probability*."

Without applicable federal guidance, the Court can—in some instances—look to the forum state for guidance. *See e.g. Burnett v. Grattan,* 468 U.S. 42 (1984). However, even that does not help the Court in this case. While some statutes in Idaho require that a medical opinion must be medically certain,[8] in other situations, the Idaho Supreme Court has required the expert opinion be medically probable.[9] Additionally, the words are used interchangeably in some instances. Without a firm base, the Court must fall back on Rule 702. A witness qualified by knowledge, skill, experience, training or education may offer expert testimony where: (1) the opinion is based upon sufficient facts or data, (2) the opinion is the product of reliable principles and methods; and (3) the witness has applied those principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *See also Daubert,* 509 U.S. at 592–93. The Court here is not interested in a war of words, but notes that it will not allow Daines—or any other expert for that matter—to assert before the jury that an expert's opinion must be medically *certain* to be credible when such a standard is not supported by case law or statute.

BendPak is well within its rights to question and criticize Selznick's opinions, however, this does not make them inadmissible. Admissibility is based upon relevance and reliability. The Court finds that Selznick has adequately supported his opinions and

---

[8] For example, in a medical malpractice suit, an expert testifying on the community standard, must establish such with "reasonable medical certainty." Idaho Code § 6-1013.

[9] For example, the proof required for causation is "reasonable degree of medical probability." *See Hartgrave v. City of Twin Falls*, 413 P.3d 747, 752 (2018) (quoting *Serrano v. Four Seasons Framing*, 336 P.3d 242, 250 (2014); *see also Reynolds v. Browning Ferris Indus.*, 751 P.2d 113, 116 (1988) (noting the "medical probability" of future increased costs).

that they are relevant to the issues presented. Selznick's conclusions may differ from Daines and Nickisch, but those differences alone do not rise to the level of exclusion from consideration. The Court DENIES BendPak's Motion to exclude Selznick's testimony regarding future medical care and damages.

## V. ORDER

**The Court HEREBY ORDERS:**

1. Cusack's Motion to Exclude the Testimony of Joshua Yanes (Dkt. 68) is GRANTED.

2. BendPak's Motion to Exclude the Testimony of Scott Kimbrough (Dkt. 69) is GRANTED in PART and DENIED in PART as outlined above.

3. BendPak's Motion to Exclude Certain Portions of Tyler Bowles' Testimony (Dkt. 70) is DENIED.

4. Cusack's Motion to Strike Exhibit F (Dkt. 75) is GRANTED.

5. BendPak's Motion to Exclude the Testimony of Hugh Selznick (Dkt. 71) is DENIED.

DATED: August 15, 2018

David C. Nye
U.S. District Court Judge