UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COREY CUSACK, individually,<br><br>    Plaintiff,<br><br>    v.<br><br>BENDPAK, INC., a foreign corporation,<br><br>    Defendant. | Case No. 4:17-cv-00003-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court are numerous Motions filed by the parties in preparation

for trial. Both parties filed Motions in Limine seeking to preclude certain evidence and

testimony from trial. Dkts. 92, 94. Additionally, BendPak has filed two Motions to

Reconsider (Dkts. 99, 100) and Cusack has filed a Motion to Strike (Dkt. 111). Having

reviewed the record and briefs, the Court finds that the facts and legal arguments are

adequately presented. Accordingly, in the interest of avoiding further delay, and because

the Court finds that the decisional process would not be significantly aided by oral

argument, the Court will decide the Motion without oral argument. Dist. Idaho Loc. Civ.

R. 7.1(d)(2)(ii). For the reasons outlined below, the Court will GRANT in PART and

DENY in PART both sides' Motions in Limine, DENY BendPak's Motions for

Reconsideration, and GRANT Cusack's Motion to Strike.

## II. DISCUSSION

### A. Motions in Limine

#### 1. Legal Standard

"Motions in limine are well-established devices that streamline trials and settle evidentiary disputes in advance, so that trials are not interrupted mid-course for the consideration of lengthy and complex evidentiary issues." *Miller v. Lemhi Cty.*, No. 4:15-CV-00156-DCN, 2018 WL 1144970, at *1 (D. Idaho Mar. 2, 2018) (citing *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002)). "The term 'in limine' means 'at the outset.' A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (quoting Black's Law Dictionary 803 (8th ed. 2004)).

Because "[a]n in limine order precluding the admission of evidence or testimony is an evidentiary ruling," *United States v. Komisaruk*, 885 F.2d 490, 493 (9th Cir. 1989) (citation omitted) "a district court has discretion in ruling on a motion in limine." *United States v. Ravel*, 930 F.2d 721, 726 (9th Cir. 1991). Further, in limine rulings are preliminary and, therefore, "are not binding on the trial judge [who] may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).

## 2. Analysis

### i. Cusack's Motions in Limine[1]

#### 1. Opinion testimony by defense witnesses that the rolling jack that fell on Corey was not defective.

**GRANTED.** This argument requires an expert opinion as it deals with scientific, technical, and specialized knowledge. BendPak asserts that Jeff Kritzer, its 30(b)(6) deponent, can testify as to these issues, however BendPak has not disclosed him as an expert under Federal Rule of Evidence 702. The Court will limit both sides to expert witnesses properly disclosed under Rule 702 and fact witnesses whose testimony complies with Rule 602 and Rule 701.

#### 2. Testimony, evidence, or argument by defense witnesses suggesting Corey touched, moved, or tried to move the rolling jack that fell onto his foot.

**GRANTED** to the extent that factual testimony must be based on personal knowledge and comply with Rule 602 and expert testimony must have been properly disclosed and comply with Rule702.

---

[1] For brevity, and due to time constraints, the Court will not reiterate each sides' arguments, but will simply rule on each motion with brief reasoning, analysis, and/or parameters. Additionally, the Court's rulings on these motions are interlocutory. If the "door is opened" at trial for any particular item, the Court will reconsider that topic.

3. **Testimony, evidence, or argument that BendPak was the industry leader or that the rolling jack that fell on Corey exceeded industry standards.**

**GRANTED.** The only witness remaining that could testify to these issues is BendPak's 30(b)(6) deponent, Jeff Kritzer. However, as noted above, BendPak has only listed Kritzer as a fact witness. Accordingly, Kritzer can testify consistent with his personnel knowledge, but nothing more.[2] Any other testimony must strictly comply with Rules 602, 701, and 702.

4. **Testimony, evidence, or argument that, before Corey purchased the rolling jack, BendPak conducted testing to determine the potential for the rolling jack to fall from the four-post lift.**

**DENIED.** To the extent that there are individuals (fact witnesses) who have personal knowledge of testing, or expert witnesses who have been properly disclosed, the Court will allow in testimony on this topic. Cusack will have a chance to cross-examine any witness as to the scope and applicability of any testing.

5. **Testimony, evidence, or argument regarding Corey's marriage counseling.**

**GRANTED.** BendPak has stipulated to not introduce evidence on this topic.

---

[2] The mere fact that he was identified as a Rule 30(b)(6) deponent for purposes of discovery does not mean he can testify at trial about matters within the "corporate" knowledge but outside his personal knowledge.

6. **Testimony, evidence, or argument regarding settlements or settlement negotiations between Corey and any of the named defendants.**

**GRANTED.** However, there will be no double recovery in this case. Therefore, if a verdict is entered awarding damages to Cusack, BendPak will be allowed to conduct post-verdict discovery for collateral sources.

7. **Testimony, evidence, or argument suggesting Corey was harmed by the product beyond its useful safe life.**

**GRANTED.** BendPak has stipulated to not introduce evidence on this topic.

8. **Testimony, evidence, or argument suggesting Corey failed to inspect the rolling jack for a defective condition.**

**GRANTED in PART, DENIED in PART**. In the broad sense of the word "defect" Cusack is correct: the law does not require him to show that he inspected the product for a defective condition. Furthermore, there is no evidence that prior to the accident, Cusack was aware of the allegedly defective condition, i.e. that the Rolling Jack could fall. However, Cusack readily admits that he personally did not inspect the Rolling Jack to ensure it was secure before the Subaru was driven onto the lift and hoisted for work.

Accordingly, the Court will not allow testimony that Cusack failed to inspect for a "defect" generally, but will allow testimony, evidence, and argument that Cusack did not inspect the Rolling Jack prior to it being hoisted in the air.

**9. Testimony, evidence, or argument suggesting a nonclaimant failed to inspect for defects or to observe an obvious defective condition of the rolling jack.**

**GRANTED**. As noted in the Court's discussion regarding Yanes' testimony on this topic, *see infra* Section B(2)(ii), this proposition is too speculative to present to a jury. Nobody can identify this individual's identity, let alone his behavior. All fact witnesses are limited to their personal knowledge of events and all expert witnesses are limited to their properly disclosed opinions.

**10. Testimony, evidence, or argument suggesting a nonclaimant product user knew the rolling jack was defective but voluntarily and unreasonably used or stored the rolling jack.**

**GRANTED**. As noted above, there is no way to know what the "phantom driver" (the unknown employee who drove the Subaru onto the lift and raised it off the ground) knew, or did not know; did, or did not do. The Court will allow testimony that nobody knows what this person did,[3] but not evidence speculating as to this person's actual behavior or knowledge.

**11. Testimony, evidence, or argument suggesting that Corey or another product user misused the rolling jack.**

**GRANTED in PART, DENIED in PART.** The Court will not preclude testimony or evidence of misuse to the extent that BendPak wishes to introduce evidence

_____

[3] In other words, consistent with Cusack's prior testimony, BendPak can ask questions about the phantom driver and if Cusack knows whether he inspected the jack before raising the lift etc., but cannot speculatively impute knowledge or behavior to this individual.

that Cusack did not follow a manual or guideline—i.e. that Cusack's behavior in raising the lift, or, in not lowering the lift to the ground for inspection, was a "misuse" of the product. The Court will, however, preclude any evidence that Cusack (or any unknown employee) was misusing the product *in general* as there is no evidence to support this fact.

12. **Testimony, evidence, or argument suggesting that Corey was injured by a defective condition that would have been obvious.**

**GRANTED in PART, DENIED in PART.** The impetus for this entire lawsuit is the fact that while working, Cusack noticed the Rolling Jack was out of alignment and went to correct the problem. There is no evidence, however, that prior to that moment Cusack was on notice that the Rolling Jack could fall. While it may have been "obvious" that Cusack should not have tried to address the problem while the lift was raised with a car on it, it was not obvious that there was a defective condition. In other words, the Rolling Jack being off the lift, in itself, was not a defective condition; regardless of how obvious it was.

The Court will not allow testimony that any defective condition was obvious—after all BendPak alleges there is no defect—but will allow testimony that dealing with a dangerous condition involving large equipment was—as Cusack himself states—"obviously" a delicate situation.

### 13. Testimony, evidence, or argument suggesting that Corey was injured by an altered or modified product.

**GRANTED in PART, DENIED in PART.** This conclusion requires an expert opinion. Neither party has identified an expert opinion along these lines. Accordingly, no testimony or evidence will be presented that Cusack *was injured* by alterations or modifications. However, the fact that Cusack altered or modified the Rolling Jack before the accident is a relevant fact already in evidence that can be presented at trial. The Court does not see how Cusack's post-accident modifications are relevant. Under Federal Rule of Evidence 407 these modifications are most likely subsequent remedial measures and cannot be used *by, or against, either party* to prove negligent conduct.

### ii. BendPak's Motions in Limine

### 1. To preclude evidence of "dicta" regarding telescoping arms and/or stop bolts as design defects and/or the proximate cause of the alleged injuries.

**DENIED.** The Court noted in its prior Decision (Dkt. 89, at 14) that Cusack's assertion that these were expert opinions was slightly overstated because Kimbrough's fundamental opinion is that the Rolling Jack was defective because it could fall. The explanation for this conclusion includes the telescoping arms and stop bolts (for a pre-accident defect theory) and the secondary safety bracket (for a failure to warn of post manufacturing discovered defect theory). Importantly, the Court did not preclude this information or testimony, but merely noted that it was not itself an expert opinion, but rather supporting evidence for the overall proposition.

### 2. To preclude evidence of BendPak's labels, warnings, instructions, and manuals as evidence of a design defect or knowledge of a defect.

**GRANTED in PART, DENIED in PART.** As the Court has already noted, putting warnings on a product is good business practice—and wise consumer protection—not indications of known problems or defects. The Court will preclude any evidence of the original warnings and labels if introduced as evidence of a design defect.[4]

However, Idaho Code section 6-1406(1) specifically outlines that changes in warnings or labels can be admissible under a duty to warn theory. The Court will therefore not exclude evidence or testimony of subsequent modifications to warnings or labels.

### 3. To preclude any evidence of BendPak's other lawsuits, injuries, or knowledge the rolling jack could fall.

**GRANTED in PART, DENIED in PART.** From a timing standpoint, anything that happened before Cusack's accident could be relevant as it goes to the theory that BendPak was on notice of possible defects but failed to warn Cusack and others. The Court finds it difficult, however, to accept that anything that occurred after Cusack's accident is relevant in this case.

Finally, unless an expert can testify that the rolling jack models are substantially similar, the Court will only allow examples where the RJ-7 model was at issue. In short,

---

[4] Presumably BendPak will introduce these warnings and labels for other purposes.

the Court will hold a hearing outside the presence of the jury to determine which lawsuits or injuries, if any, either party will be allowed to introduce at trial.[5]

### 4. To preclude evidence and statements regarding additional warnings.

**GRANTED.** Cusack has stated that he does not intend to introduce testimony as to any action Cusack would have taken differently had he known about the secondary safety bracket or additional warnings. Likewise, BendPak will not be able to introduce evidence on this topic, as it would be pure speculation.

### 5. To preclude undisclosed and speculative evidence.

**DENIED.** This evidence—specifically Kimbrough's three opinions —has been properly disclosed.[6] The Court has already found Kimbrough qualified to testify. Therefore he can render opinions based upon his experience and expertise. BendPak will have adequate opportunity to cross examine this witness as to each opinion.

## B. Motions to Reconsider

### 1. Legal Standard

As this Court has previously noted, "neither the Federal Rules of Civil Procedure nor the Local Rules provide for a motion to reconsider." *Hathaway v. Idaho Pac. Corp.*, No. 4:15-CV-00086-DCN, 2018 WL 3797498, at *2 (D. Idaho Aug. 8, 2018) (citing

---

[5] BendPak notes in its response to Cusack's first Motion in Limine that its 30(b)(6) Deponent, Jeff Kritzer, is prepared to testify concerning "injuries, accidents, litigation and/or complaints, if any, related to the BendPak products allegedly at issue."

[6] This does appear to be a renewed *Daubert* motion against Kimbrough.

*Magnus Pac. Corp. v. Advanced Explosives Demolition, Inc.*, No. 2:13-CV-0060-EJL-CWD, 2014 WL 3533622, at *1 (D. Idaho July 15, 2014)). Nevertheless, if a party moves for reconsideration prior to a trial taking place, the appropriate avenues for reconsideration are Rules 59(e) or 60(b). *See, School Dist. No. 1J, Multnomah County, OR v. ACandS, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993).

Here, BendPak asserts that it is seeking relief under Rule 60(b); *however*, BendPak cites the standard for Rule 59(e) in its briefing.

Under Rule 59(e), reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust; or (3) if there is an intervening change in controlling law. *Id.* at 1263.

Under Rule 60(b) reconsideration is only appropriate upon a showing of (1) mistake, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) a void judgment; (5) a satisfied or discharged judgment; (6) extraordinary circumstances which would justify relief. *Id.* at 1264.

Regardless of which rule the Court utilizes, both are an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). Furthermore, the grant or denial of a motion for reconsideration is a matter within the district court's discretion, i*d.* at 883, and "should not be granted, absent highly unusual circumstances." *Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999).

## 2.  Analysis

### i.  Exclusion of Safety Bracket

In its first Motion to Reconsider (Dkt. 99), BendPak asks this Court to revisit its April 12, 2018, Decision. Dkt. 58. Specifically, BendPak seeks reconsideration of the Court's ruling regarding the admissibility of a secondary safety bracket. A brief summary is appropriate.

On November 30, 2017, BendPak filed a Motion in Limine (Dkt. 29) seeking to preclude evidence of remedial measures under Rule 403 and Rule 407 of the Federal Rules of Evidence. The facts of the case show that BendPak added a secondary safety bracket to the RJ-7 Rolling Jack after Cusack purchased one, but before his accident. Cusack sought to introduce this as evidence of subsequent remedial measures. The Court ultimately determined that, pursuant to Idaho Code section 6-1406(1), "Cusack will not be allowed to introduce evidence of BendPak's adding of the secondary safety bracket for purposes of negligence, defect etc., but will be able to introduce it under a 'failure to warn' theory." Dkt. 58, at 9. Thus, the Court ruled that Cusack could introduce evidence of the secondary safety bracket, but only in a limited way.

The Court reiterated this in its *Daubert* Decision (Dkt. 89) and specifically noted that the "parties must be extremely careful how they introduce evidence of the secondary safety bracket" at trial. Dkt. 89, n.2. The Court will not regurgitate the substance of that Decision here, but notes that after analyzing the testimony of the respective experts, it further limited the ways in which evidence of the secondary safety bracket could be

introduced at trial. The Court gave very specific examples of how it could—and could not—be used in support of any theory. In short, the secondary safety bracket cannot be used to support a design defect theory, but can be used to support a failure to warn of discovered post-manufacturing defects claim.

Cusack premises his failure to warn argument on the idea that BendPak learned of a defect after the RJ-7 was manufactured but failed to alert existing customers to this discovered defect. Cusack offers the secondary safety bracket in support. Under Idaho Code section 6-1406(1), this is completely appropriate.[7]

By way of the instant Motion, BendPak does not take issue with the Court's original analysis, or even the specifics of how experts can use evidence of the secondary safety bracket, but harkens back to Federal Rule of Evidence 403 and asserts that the probative value of the evidence of the secondary safety bracket is substantially outweighed by the prejudice to BendPak.

Federal Rule of Evidence 403 states:

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

The Court addressed this issue in its original decision as follows:

Because the Court will only allow Cusack to proffer this evidence in support of his theory that BendPak failed to properly warn customers, prejudice or confusion will not result. BendPak will have an opportunity to put forth its

---

[7] See the Court's analysis of Idaho Code section 6-1406(1) in its prior decisions. Dkt. 58, at 7-8; Dkt. 89, at 16.

theory and testimony that the secondary safety bracket was innovation for further safety and to appease a favored customer, but not the result of any dangerous flaw or defect that would have required notice or warnings to customers regarding past products.

Dkt. 58, at 9-10.

Based, in part, on the Court's prior ruling regarding one of Cusack's experts and how he can utilize evidence of the secondary safety bracket in his testimony, BendPak now asserts that the secondary safety bracket is essentially irrelevant. Specifically, it claims: "Plaintiff's expert, Dr. Scott Kimbrough, opined the discovered 'defect' is the possibility of rolling jack falling off its rail. Thus, BendPak has allegedly violated a post-manufacturing duty to warn the rolling jacks could fall. Therefore, the secondary safety bracket is not necessary for Plaintiff's post-manufacture failure to warn claim." Dkt. 99-1, at 3.[8]

However, the Court previously ruled that this is exactly how evidence of the secondary safety bracket *could* be used. In essence, Cusack's theory is that after manufacturing and production, BendPak discovered that the Rolling Jack could come off the rails and fall (BendPak does not believe there is a "falling" design defect based upon the telescoping arms or stop bolts). Based upon this discovery, BendPak developed a

---

[8] BendPak frequently conflates the two "defect" theories raised by Cusack. In reality, there really is only one defect claim: Strict Liability – Design Defect. The design defect—as alleged by Cusack—is that the Rolling Jack could fall. Cusack supports this proposition with the fact that the telescoping arms and stop bolts failed to prevent the jack from falling off the rails. A completely separate claim is Cusack's "Strict Liability – Failure to Warn" claim. It is in support of this claim that Cusack wishes to introduce evidence of the secondary safety bracket.

secondary safety bracket and including this bracket on newer models. Cusack's contention, however, is that BendPak did not warn existing customers of the defect or provide the secondary safety bracket—which prevents the Rolling Jack from falling off the rails. Thus, the evidence is still extremely relevant, and has probative value.

Second, BendPak argues that regardless of how this evidence is introduced, even with the Court's previous rulings, evidence of the secondary safety bracket—if introduced—will "imply to a jury the existence of a design defect at time of manufacture, which this Court has expressly forbidden for that very purpose," and that the "jury's immediate knee-jerk reaction [will be] that the BendPak Car Lift or Rolling Jack's design upon entry into the stream of commerce was defective." Dkt. 99-1, at 3.

The Court does not deny that it takes some thought to understand the distinction, as outlined in footnote seven, between the "design defect" argument and the "discovered defect – failure to warn" argument. However, the attorneys can articulate this difference to a jury, and, as the Court noted in its original decision on this issue, BendPak will have ample opportunity to rebuff this "implication" and clarify that there was no design defect (in their opinion) and that even the introduction of the secondary safety bracket after manufacturing was not done to fix a dangerous or defective product, but instead served as an innovative upgrade.

The Court is concerned—as it has been all along—that there is some overlap in how this evidence might be presented (and understood). To that end, the Court has been very specific (in this Decision and elsewhere) in its directions on how the parties are to

introduce and use the secondary safety bracket. However, these concerns do not "substantially outweigh" the probative value that this evidence provides. The Court has analyzed this topic in depth and finds that Cusack can introduce evidence of the secondary safety bracket as outlined in this decision and its prior decision. *See* Dkt. 89, at 14-17.

Accordingly, the Court will not alter its previous holding, nor preclude this evidence entirely from trial. BendPak's Motion for Reconsideration regarding the admissibility of the secondary safety bracket is DENIED.

### ii. Joshua Yanes

BendPak's second Motion for Reconsideration (Dkt. 100), asks the Court to revisit its findings that one of BendPak's experts, Joshua Yanes, was not sufficiently qualified to testify regarding his opinions; and that many of his opinions were speculative or irrelevant.

In its prior decision, the Court found that Yanes had not established how his area of expertise (dealing with various non-vehicle lifts) encompasses the technology at issue in this case (vehicle rolling jacks). By way of the instant motion, BendPak seeks to explain the relevant similarities and differences. Additionally, although Yanes originally provided eight conclusions or opinions, BendPak only seeks the Court's reconsideration as to three of them: specifically, conclusions 2, 4, and 8. In the event the Court does not reconsider Yanes as an expert, BendPak requests that he be permitted to testify as a fact witness as he was one of only a handful of individuals who observed and inspected

Corey's Auto Works in October 2017. Finally, BendPak asserts that Yanes took photos during this visit and that it (BendPak) will need him as a foundational witness for the admittance of these photos—unless, of course, Cusack stipulates to their admission.

BendPak contends that while Yanes does not specifically state he is an expert in car lifts, lifts in general operate in the same fashion—using hydraulics and scissor legs to lift or lower the platform—and therefore Yanes's testimony falls within the "reasonable confines" of his expertise. Yanes's self-purported areas of specialization include "fork lift, boom lift, [and] scissor lift accident analysis." Dkt. 87-2, at 2. As the Court noted in its prior decision, while it is true that the functionality of these various devices might be similar, they have "different specifications and purposes." Dkt. 89, at 5. A boom lift is typically used to hoist a person into the air; a fork lift is typically used to move pallets or heavy objects; and a scissor lift can be used to hoist people or objects. In sum, none of these devices deal with automobiles.

Importantly, the Court's concern regarding Yanes's qualifications was only half the problem. The other issue is the substance of Yanes's conclusions.

> Conclusion 2: *It is likely that the grooved rollers for the jack were off track while the lift was previously on the ground and possibly before the Subaru was driven on the lift runways.*

The Court previously ruled that this conclusion was speculative as Yanes could not point to any "tests, measurements, or other research he conducted . . . that would aid the jury in understanding when, and how, the RJ-7 jack came off the tracks." Dkt. 89, at

6. In the current motion, BendPak lists eight observations, or sources of information, in support of its conclusion that Yanes' opinion *is* based upon verifiable data.

Most of these eight observations stem from Cusack's own statements regarding the fact that (1) he did not verify the position of the jack while it was on the ground, (2) he does not think the Subaru that was driven onto the lift could have hit the Rolling Jacks, and (3) he ultimately does not know how the jack fell off. Admittedly, one inference from this information is that the rollers were off track while the lift was still on the ground. However, as will be discussed below, because the unknown employee and his behavior is a complete unknown, it is just as easy to speculate that the rollers came off track long before the lift was on the ground (for the Subaru) or that they came off track later, but for an entirely different reason—such as physical touching or jostling by another employee at an undetermined time or ultimately even from the lift vibrating when Cusack moved the front rolling jack. In sum, although Yanes's conclusion is not wholly without support, it is still subjective and speculative. This lack of foundation, coupled with Yanes's lack of expertise as to vehicle rolling jacks weighs against presenting this conclusion and testimony to a jury.

The Court notes, however, that each of these observations can be introduced via their original source—Cusack—during cross-examination, or from any other expert under a "is it possible" line of questioning. Cusack has been aware from the beginning that this was a theory purported by BendPak—that the Rolling Jacks were off the rails from the start. Cusack readily admits that he does not know what caused the rollers to come off the

track. BendPak's suggested theory is appropriate. However, allowing an expert to take the stand and say to a jury that it is "likely" and "possibl[e]" that X was the situation with nothing more than the negative inference—i.e. that because nobody knows, it must be X—or a lack of evidence in general—i.e. that because nothing else suggests otherwise, it must be X—is not in line with the standards enunciated in *Daubert*.

> Conclusion 4: *The unknown employee failed to follow the manual and decal instructions of checking to make sure the jack was positioned correctly on the runway rail assembly before raising the lift.*

As the Court noted in its original decision, this conclusion is speculation based upon unknown factors. Dkt. 89, at 8. Because there is no way to know the identity of the unknown employee there is no way to ascertain whether he followed, or failed to follow, any manuals. The conclusion here, as before, starts at the end and returns to the beginning. The assumption is because the Rolling Jack fell, it must have been off the tracks. BendPak asserts (or assumes) that the jack came off the tracks while the jack was still on the ground. Therefore, the assumed conclusion is that the unknown employee failed to check the jack while it was still on the ground.

As the Court noted previously, even had the employee done all that was required of him, the Rolling Jack could have come off track for a completely unrelated reason. Furthermore, like Yanes's above conclusion, the Court is not implying that this claim is "wildly improbable," but cannot in good faith allow an expert—someone who the jury expects to have detailed knowledge, sound evidence, and reasonable conclusions—to speculate as to the unknown behavior of an unknown person.

Conclusion 8: *Review of the domestic market showed that competing rolling bridge jacks designs did not include any devices to prevent vertical displacement.*

Finally, BendPak argues that Yanes's conclusion regarding the domestic market is relevant to its "State of the Art" defense. As will be outlined below, that defense has not been properly plead. That aside, the Court has ruled that this material is more of an "industry standards" argument, which the Court has already stated faces limited disagreement from Cusack. The Court views this "opinion" as more of a fact, rather than an expert conclusion.[9]

As noted above regarding Cusack's Motion in Limine #3, Jeff Kritzer can testify that BendPak is the only company to his knowledge that produces a product to prevent vertical displacement, but he cannot say that this means BendPak exceeds any industry standards or is the industry leader. He can say that BendPak has not violated any industry standards—after all Cusack himself acknowledges this—but beyond that, any opinion regarding standards is pure speculation. This fact—that BendPak is the only company that makes a device to prevent vertical displacement—does not require an expert opinion and, as the Court explained in its prior Decision, "will come to light during trial through other witnesses and testimony." Dkt. 89, at 11.

---

[9] Now, if the Court were to allow evidence that BendPak *exceeded* industry standards, an expert would be necessary; however, the Court has already determined that such a conclusion is not supported by the singular fact that no other companies have a secondary safety bracket. That difference is not necessarily indicative of better performance or exceeding any relevant standards, but is just that: a fact. BendPak has a secondary safety bracket; other companies do not.

In conclusion, the Court's prior decision stands. Although BendPak's explanations as to Yanes's qualifications has been helpful, it does not alleviate all the Court's concerns. However, even assuming, *arguendo*, that Yanes was qualified to testify, the three conclusions BendPak asks the Court to reconsider suffer from their own flaws. The first two are based on speculation and the third will come out via other testimony.

BendPak's Motion for Reconsideration of the Court's order excluded Joshua Yanes from trial is DENIED.

Additionally, the Court will not allow Yanes to testify as a fact witness either. First, BendPak has not disclosed him as a fact witness, and doing so now would be prejudicial. Second, the Court is concerned that because Yanes's engagement with this case was in the capacity of an expert witness, his expert testimony might spill into his fact testimony. It appears that his fact testimony would be based upon the physical set up and conditions of Cusack's shop in November 2017. There are others who can testify to these facts.

Finally, it appears that Cusack has stipulated to the admission of many of the photographs BendPak seeks to admit at trial that Yanes took during his visit to Cusack's shop. If there are photos that Cusack will not stipulate to, the Court will allow BendPak to call Yanes for the sole purpose of laying foundation for the photographs at issue.

## C. Motion to Strike

Under FRCP 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *See also Falash v.*

*Inspire Acads., Inc.*, No. 1:14-CV-00223-REB, 2015 WL 4656505, at *1 (D. Idaho Aug. 6, 2015).

Here, Cusack does not seek to strike only certain portions of BendPak's Answer (such as affirmative defenses)—although that is arguably the impetus for this Motion—but rather, Cusack asks the Court to strike BendPak's Answer in its entirety as untimely. Again, some background is helpful.

On December 8, 2017, Cusack filed a Motion to Amend Complaint. Dkt. 32. In his Motion, Cusack sought to add a claim for punitive damages and to remove all Defendants except BendPak from the case caption and factual allegations of the Complaint. The Court determined that Cusack had not met his burden regarding punitive damages and denied that part of his Motion.[10] Dkt. 58, at 14. The Court granted the other portion of Cusack's Motion and allowed him to remove all Defendants, except BendPak, from the case caption and contents of the Complaint. *Id.* Cusack timely filed an Amended Complaint on April 26, 2018. Dkt. 60. On August 27, 2018, BendPak filed what amounts to an Amended Answer to Cusack's Amended Complaint, asserting numerous affirmative defenses,[11] which BendPak had not alleged prior to that time. Dkt. 95. Cusack now moves to strike this Answer.

_____

[10] The Court noted, however, that Cusack could renew the motion during trial, if appropriate. Dkt. 58, at 14.

[11] Among other things. There are, in fact, other edits throughout the Amended Answer, however, the affirmative defense are what Cusack takes greatest issue with.

For its part, BendPak alerts the Court to the fact that following Cusack's filing of his Amended Complaint, it filed a Motion to Dismiss (Dkt. 66) thus tolling the time it had to answer until the Court ruled upon that Motion. This is a correct assertion; however, BendPak even missed that deadline. The Court ruled upon BendPak's Motion to Dismiss on August 7, 2018. BendPak's answer would then have been due on or before August 21, 2018. BendPak explains that there was a communication and calculation error between Counsel and staff regarding when the Answer was due. BendPak asserts that it was not aware of its error until Cusack filed the instant Motion to Strike.

As a threshold matter, Federal Rule of Civil Procedure 15 outlines that an Answer must be filed within 21 days of the filing of any Complaint or Amended Complaint. Second, if a party fails to meet the 21-day requirement, it can only amend with the opposing party's consent or with leave of the Court. BendPak did not ask Cusack or the Court for permission to amend its Answer; however, that is understandable given BendPak's explanations that it did not believe its Amended Answer was untimely. As part of its response to the instant Motion, BendPak now seeks permission of the Court to file its Amended Answer.

Similarly, Cusack correctly notes that pursuant to Idaho Local Rule 15.1, the party seeking amendment must submit a redlined version of the document they seek to amend. Although BendPak did not originally do this, in response to the instant Motion, BendPak has complied.

Although BendPak's Motion was technically six days late, the Court is more concerned with the fact that at the time BendPak filed its Amended Answer, trial was only four weeks away, and discovery had been closed for over eight months.

In other words, the Court is not as concerned with the timeline looking back, but the timing moving forward, particularly in light of the substance of BendPak's Amended Answer. Introducing new theories and defenses at this late stage is prejudicial to Cusack. There is inadequate time to prepare for these positions and the opportunity to depose people on these topics or develop expert opinions on the same has long since passed.

The Court notes that, technically speaking, Cusack did make some minor additions to his Complaint beyond just removing all Defendant (except BendPak) as originally requested. These additions and clarifications went to the topic of the secondary safety bracket which the Court had addressed—in the same decision containing its ruling on the motion to amend—and how that piece of evidence could be used. Thus, an argument *could* be made that BendPak should have a chance to respond to those limited additions that expounded upon the secondary safety bracket. BendPak does not make this argument, but even if it did it would be unavailing because none of the new additions in its Amended Answer deal with the secondary safety bracket. Thus, it does not appear that the additions that Cusack made—and that could have been the incentive for an Amended Answer—were of concern to BendPak. Rather, it appears that this is a true Amended Answer.

BendPak asserts that the six affirmative defenses it added in its Amended Answer are not truly new, but that it has been pursuing these theories since the beginning of the case. The Court is not as convinced.

In support of its Motion, BendPak cites to an Idaho Supreme Court case, wherein that Court determined that "a party does not waive an affirmative defense for failing to raise it in the initial answer, so long as it is raised before trial and the opposing party has time to respond in briefing and oral argument." *Patterson v. State Dept. of Health & Welfare*, 256 P.3d 718, 724 (Idaho 2011). It is crucial to note that *Patterson*—and the case the *Patterson* Court relied upon for this proposition—was at the summary judgment stage. The *Patterson* Court determined that because the opposing party had an opportunity to respond to the new defense brought up in the Motion for Summary Judgment there was no prejudice and the defense was not waived.

BendPak makes the loose connection from *Patterson* to the present case and asserts that because Cusack "had an opportunity" to respond all along the way—through briefing and oral argument—he has suffered no prejudice. The Court cannot accept this proposition.

First, as the Court outlines in detail below, BendPak has not met its burden to show that these topics were brought up previously. Second, to be frank, even if BendPak had discussed these topics previously, Cusack was unaware that these were affirmative defenses BendPak was planning to raise. The arguments and facts raised previously might have fallen into the category of one of the defenses now asserted, but Cusack was

not preparing his case in that manner. By way of this Amended Answer, BendPak has essentially put official titles on all of its various arguments.

The Court does not have time—nor the obligation—to look though the entire record to find a fact cited or argument presented that could be interpreted as one of the purported "legal theories" BendPak now raises as an affirmative defense. However, even using BendPak's citations, there are still gaps in the record.

BendPak puts forth six affirmative defenses in its Amended Answer not previously raised: (1) unavoidably unsafe products; (2) spoliation of evidence; (3) alteration; (4) misuse; (5) assumed risk; and (6) state of the art. The Court will discuss each in turn.

### 1. Unavoidably unsafe product

BendPak claims that it has been arguing its "unavoidably unsafe products" defense since the beginning and points to its opposition to Cusack's Motion to Amend Complaint (Dkt. 39; specifically, page 12) and its response to an interrogatory about misuse as examples. The connection here is tenuous, at best.

First, page twelve of the referenced brief deals exclusively with caution decals and warning labels and BendPak's position that Cusack ignored these. Additionally, it should be noted that this whole discussion was not really in an affirmative defense setting, but in response to Cusack's motion to add a claim for punitive damages; which the Court ultimately rejected. Second, the interrogatory goes more towards misuse, and, like the brief just cited, covers BendPak's position that Cusack ignored warnings and that it was

unwise to try to move the 350 pound jack while in the hoisted position. While this is *arguably* a little closer—the idea that the object is heavy and standing under it could be dangerous or that warnings indicate danger—it does not necessarily mean the product is "unavoidably safe." There are lots of objects that are heavy, but that does not make them unavoidably safe. Also, as anyone who has bought anything of value knows, the included instructions, cautions, policies, warnings, and the like are extensive. This too is not indicative of an unavoidably unsafe product. The Court does not find support for this theory in the record.

## 2. Spoliation of evidence

BendPak lumps spoliation of evidence and alteration of the product into one sentence asserting support exists for both in its Motion opposing Cusack's Motion for Summary Judgment (Dkt. 40) as well as excerpts from Cusack's testimony. While there may be support for alteration of the product—as will be discussed below—Dkt. 40 is completely void of any reference to spoliation of evidence. Furthermore, BendPak's references to Cusack's testimony are far from enlightening. In essence, Cusack states that he does not know what happened to the jacks after the incident—who moved them, put them back together, or took pictures of them. This is a far cry from spoliation of evidence. The Court will not indulge this theory further as spoliation of evidence is an entire body of law with specific requirements and elements. Suffice it to say, none of those requisite elements are met here. The Court does not find support in the record for this theory.

### 3. Alteration of product

As noted above, BendPak relies upon its opposition brief to Cusack's Motion for Partial Summary Judgment (Dkt. 40-1) to find support for the idea that Cusack has been on notice of this theory all along. In his Motion for Summary Judgement (Dkt. 37), Cusack asked the Court to rule as a matter of law that contributory negligence was not an affirmative defense available to BendPak.

In its brief in opposition, BendPak discusses at length the alterations (and misuses) it believes Cusack made and argues that there are disputed facts that preclude the Court from ruling in Cusack's favor. In his reply, Cusack conceded that there were material facts at issue and that contributory negligence was most likely an available defense.

At oral argument on the motion, this issue took a slightly different turn and focused on whether contributory negligence could be imputed to Cusack vis-à-vis an unknown party—the "phantom" driver. Ultimately the Court decided that only Cusack and BendPak could be found liable in this action and any contributory negligence—on Cusack's part or any of his employees—would be attributed to Cusack.

Of any of the new defenses, "alteration" finds the most support in the record. However, each time alteration was discussed at length it was in support of another theory (contributory negligence) or was simply factual—the answer to an interrogatory as to whether Cusack installed, modified, or altered the product.

In sum, the Court does find support in the record—generally speaking—for this theory; however, nothing makes it clear that alteration was an *affirmative defense*

BendPak planned on raising rather than just a supporting argument. Furthermore, while Cusack may have had *an opportunity* to respond, this circumstance is different from that standard outlined in *Patterson* because Cusack did not actually know this was an affirmative defense.[12]

The Court must make clear, however, that just because it is not allowing BendPak to assert the affirmative defense of alteration—or misuse—these facts and arguments can still be presented. BendPak properly disclosed this as evidence in support of contributory negligence and Cusack has been aware of that—in that context—all along. BendPak has stated from the outset that it believes Cusack's installation, alterations, and/or misuse contributed to the accident. This material is all proper argument, just not as an 11th hour affirmative defense.

### 4. Misuse

The analysis here is similar to the above. BendPak did discuss misuse in Dkt. 40, but that was all in support of its contributory negligence defense, not a standalone defense. Cusack never had a chance to respond. BendPak also discussed misuse in the interrogatory cited for its unavoidably unsafe products argument.

---

[12] Again, it is important to note the difference between *Patterson* and the instant case. In *Patterson*, the moving party raised an affirmative defense in support of summary judgment and the other side was then able to respond in briefing and at oral argument. Here, this is not summary judgment, nor was the defense raised as an actual affirmative defense *at a point when the briefing and oral argument were focused on that specific topic* thus giving Cusack a meaningful chance to respond. Here, BendPak raises these defenses much later and tries to "relate back" to former arguments and evidence in the record for support.

As above, this material can be presented as argument consistent with the manner in which it has been presented thus far in the case, but not as a new affirmative defense.

**5. Assumed risk**

BendPak does not provide support for this theory. The Court will not scour the record for applicable arguments as the same analysis applies: Cusack did not have notice that this was an affirmative defense, nor does he have time now to address the issue with trial only ten days away.

**6. State of the art**

Finally, BendPak asserts that it has sufficiently plead its state of the art defense throughout motion practice and discovery, namely when it discussed industry standards. BendPak asserts that the Court and Cusack have even recognized, and agreed, with these arguments. BendPak is correct. However, both the Court—and presumably Cusack—were not thinking of BendPak's arguments regarding industry standards as the impetus for a state of the art affirmative defense.

Each of BendPak's citations relate to its "industry standards" argument. The Court has limited this topic as it relates to experts—frankly, the only person who might be able to testify on this topic is Jeff Kritzer and even then, he can only testify that BendPak has something that others don't; not necessarily that this means it exceeds industry standards. In short, whatever limited material there is on this topic will come out through the appropriate means at trial, but this cannot be presented as a full-blow affirmative defense.

To summarize, the Court is mildly concerned that BendPak's Amended Answer was untimely. The Court is slightly more concerned that the amendments did not go to items amended in Cusack's Complaint.[13] The Court is most concerned with the fact that at this stage Cusack does not have time to adequately prepare for six new defenses.

Furthermore, BendPak's caselaw supporting its position that these are not new (but have been preserved) is not applicable. First, the present case is at the trial stage, not summary judgment, and although Cusack had time to address the general subject matter at issue, he has not actually had time to respond to these facts and arguments as affirmative defenses. Second, even reviewing the material supplied by BendPak in support of its argument that these theories have been plead all along, the Court can only truly find support for two of the theories—alteration and misuse—both of which will naturally come out during trial.

For all of these reasons, the Court GRANTS Cusack's Motion to Strike.

## V. ORDER

**The Court HEREBY ORDERS:**

1. Cusack's Motions in Limine (Dkt. 92) are GRANTED in PART and DENIED in PART as outlined above.

2. BendPak's Motions in Limine (Dkt. 94) are GRANTED in PART and DENIED in PART as outlined above.

---

[13] In other words, BendPak was not necessarily responding to anything in that document, but rather took the opportunity to file an Amended Answer.

3.   BendPak's Motion for Reconsider Re: Secondary Safety Bracket (Dkt. 99) is DENIED.

4.   BendPak's Motion for Reconsider Re: Joshua Yanes (Dkt. 100) is DENIED.

5.   Cusack's Motion to Strike (Dkt. 111) is GRANTED. BendPak's Amended Answer (Dkt. 95) is stricken from the record.

DATED: September 13, 2018



David C. Nye
U.S. District Court Judge